Final case for argument today is Fischer v. XTO Energy. Counsel, please proceed when you're ready. Thank you. May it please the court. My name is Ryan Hudson. I'm here on behalf of Appellants the Fischers. At counsel table with me is Hammond Suttner. I don't want to hijack your argument, but I do want to ask you about appellate jurisdiction, since we have to find that and we can't waive it. That you contend that there is a final decision, a final order under 1291, but the order is really a tentative step toward contempt proceedings. That would be the final result of enforcing an injunction. Is that right? Yes. Then if that's the case, and the district court didn't make a contempt finding and or impose a specific rule then, or injunction, then how do we have appellate jurisdiction? So this case was originally abated and screened by the 10th Circuit before the reply brief had been finalized. There was some back and forth with the district court. Our interpretation would be that the show cause order, we were left with the impossible position of either dismissing our state court claims or the Fischers would have been held in contempt. So the district court has agreed to stay its order pending the outcome of this case. I would also say this is not an argument that Exxon has raised or briefed. So it's a little bit. That goes so far, but we still have to have appellate jurisdiction.  And so why does it not have to await the district court entering a contempt order and then you appeal from that? I'm sorry? Why does your, for us to have appellate jurisdiction, why do we not have to wait for the district court to complete the loop and say, yes, you indeed are in contempt and here's what the procedures are gonna be for that? Given that that hasn't been briefed, I'm not entirely confident in my answer. I would, again, say we would have been irreparably harmed if we would have dismissed our state court claims. And given the way the show cause order was written, to my knowledge, I don't, I guess, understand why we would have to wait to be held in contempt to have jurisdiction to challenge that show cause order. Final order would be the reason. So if this court were to reverse, that would take care of the show cause order. If the court affirms, then we will dismiss the claims that are in state court. Okay, and that takes three minutes of your time and I'll stay out of your way the other 12. Okay, thank you. So we are here today on the enforcement of one class action judgment against Chieftain and XTO to try to wipe out a different case involving different parties in the state court. We have two arguments that we can prevail on, both of which are reviewed de novo and both of which are strictly construed against Exxon. So as a result, this court can reverse for either reason and it strictly construes all doubts and ambiguities in favor of us. The first issue is the injunction. In the district court, as Judge Phillips was alluding to, ExxonMobil never actually framed this case as under any legal standard. If you review the motion to enforce and if you review their brief on appeal, you're not gonna find any legal standard or even a standard of review. Likewise, if you review the district court's order, there is no legal standard whatsoever. So as a result of that, Exxon spent less than one page arguing that this was the enforcement of an existing injunction. On appeal, we have pointed out that that would implicate a civil contempt standard which requires clear and convincing evidence and proof of knowledge that the Fishers had. ExxonMobil had the opportunity to present that evidence. The court held a hearing and repeatedly asked Exxon, I'm giving you the opportunity to present whatever arguments you have. They did not present any evidence. They did not present any evidence whatsoever, let alone clear and convincing, nor did they tell the district court what the legal standard was, thus leading the district court into reversible error. That is a kill shot for us on this appeal because there is nothing in the record that would suggest the Fishers were aware of this 2018 injunction. They were class members in that case, but they were not parties. The class notice said nothing about XTO. In fact, you could apply the Control-F test in this case. Type Control-F and do a word search for Exxon. You will not find it in the settlement. You will not find it in the judgment. ExxonMobil is not in this case. This case was on behalf of XTO. So as a result of that, ExxonMobil has not met its burden. The district court's order is very clear that it is enforcing an existing injunction, and to do that, ExxonMobil was required to meet the clear and convincing evidence standard. They did not do so. That's the easiest way to reverse. If we agree with you that, on the merits of the issue, that the released parties language does not include Exxon, wouldn't that essentially mean that we would be saying that the district court had modified the injunction? Potentially. Would that be one way that, I mean, would, of course, that would require you to determine that to have appellate jurisdiction,  Again, I'm not entirely sure of my answer on that. I think it would be a modification of the injunction, and the district court's order says that it is enforcing an existing injunction, which is legal error. It's not enforcing an existing injunction. It's extrapolating and changing the injunction to say something that it does not currently say. And this court in Wirehouse versus Wyatt Company, the 2007 decision, says that the district court is not allowed to do a post hoc judgment of what was intended to say, that when you're looking at these injunctions under the Anti-Injunction Act, you have to stick to the language that is used, not the language that was unintended. Well, I think the district court thinks it did that here. I mean, it relied on the Oklahoma case, I think, or I'm trying to remember what case it relied on, the Key case. I think it thought it was doing that. I don't think it was just going off on a tangent and defining the terms itself. I think you're correct. I think that's what it thought it was doing, but I would say also on the point of the release parties, that to us is a bit of a sideshow. We think that the release claims issue is a dead bang winner for us. The district court's order does not even include the full language of the release claims definition, and most notably, and again, led into error by Exxon, doesn't include the first two sentences. I'd like to zoom in on those because they are very, very important. The first sentence says, and we call this the gateway clause, that the release applies related solely to the underpayment of royalties by defendant. That's in 1.35 of the settlement. Defendant is defined exclusively as XTO. The word litigation is further defined in 1.23 as this case, Chieftain versus XTO only. Recall the Hershey case, which Exxon cites, which in that case has the definition of litigation and specifically includes the case that was sought to be released. In this settlement agreement, in fact, three other cases are mentioned by name. And we're talking about ExxonMobil, a $300 billion Fortune 50 company that somehow forgot to include its name in this release is simply not believable. And even if it is believable, at best it's ambiguous. And as Judge Moritz was pointing out in the insurance case earlier, ambiguity is a problem here because it's strictly construed. It's even more of a problem here for the same reasons Judge Moritz was mentioning in the other case. You can read the district court's order. It simply never analyzes our arguments. It never. It analyzed the release party's argument. It did, but it did not address ambiguity. In the release claims or in the release parties? Either. Either, okay. Either, but certainly, and we're almost. I thought your ambiguity argument was going to the release claims.  Well, our ambiguity argument goes to both. And that's what Judge Parsley found in the state court as well. So we've already had one court, the state court say, as a matter of Oklahoma contract law, these terms are ambiguous. So at a minimum. Are you talking about the denial of summary judgment? Yes. All right. It was a denial of summary judgment. Correct. Because of the ambiguity. We don't have a finding of ambiguity in federal court, however, and that's not binding on us, of course. It's not binding. I'm simply saying when we're interpreting these, the language, I'm saying at a minimum, if it says related solely to XTO, for them to prevail, that language has to be, their interpretation has to be the only reasonable interpretation. By ambiguity, are you arguing about affiliate? No, I'm not arguing release parties at all. I'm talking only about the release claims.  Because. And I'm looking at that section right now and tell me what the ambiguity is again. Well, we don't, we're arguing that it's clear. I'm making the alternative argument that at a minimum, our interpretation is reasonable. And if our interpretation is reasonable, that means we win because ambiguity is strictly construed against Exxon. They do not refute that releases and exculpatory contracts are strictly construed to avoid releasing parties. And tell me this, if it weren't for the first two sentences, would you still be saying ambiguity or is that why you say ambiguity? Because the remaining language after the first two sentences hovers under its wing. Yeah, and again, I'm not arguing ambiguity. I'm saying it's clear. I'm saying we win. But if you're going to interpret that language at an absolute minimum, it is ambiguous. And the second sentence says, without limiting the foregoing, right? That is a double reminder. It doesn't just say related solely. In case you were unclear, the second sentence says, without limiting the foregoing. Then you jump down, and this is the only part that the district court even quotes, is Exxon Mobil's language. And it's a problem when you jump to the middle of a provision and you skip the first two sentences. And as we point out, within that language, it's an illustrative list of 12 causes of action. Of those causes of action, eight, nine, and 11 are not even limited to the class wells. And so under Oklahoma contract law, which we cite extensively by statute, it's 15 OS and then sections 150s. In the 150s, the 160s, and the 170s, we point out that the duty is to interpret that language to harmonize everything, to not render anything superfluous, and the district court was required to walk through that analysis and did not do so. All right, but when we look beyond the first two sentences, which obviously carry some weight, and maybe not every sentence is saying the same thing or talking about the same thing, the rest of these conditions, at least the first seven, say that the release parties underpaid royalty, blah, blah. The release parties, that's the subject. That's right. And you're telling me that, are you agreeing that Exxon is a release party or no? Yeah, for purposes of today, we are, because it's really simple. Okay, so. The first question is what is released? And that's where the first two sentences are very clear. What is released are underpayments solely by XTO. The second question is who is released? It's fine if XTO is a release party, because the first sentence controls. You never reach the second sentence until you pass through the first. Well, it says specifically include claims based in whole or in part on allegations that the release party is underpaid. Correct, related solely to XTO, and then without limiting the foregoing. Where does it say that? You're relying on the first two sentences for your? Yes, I am relying on the first two sentences because they're very clear. The settlement agreement is between XTO and Chieftain. The word ExxonMobil does not even appear in the settlement. But three other cases are mentioned by name. I want to clarify, so today you're not, we're not arguing today about release parties. I think you did in your brief.  The affiliates language is tough for you. We'll give them that because we don't need it. Okay, so I just want to make sure I'm understanding that because I came prepared to have questions about that too. We're talking about release claims, and I think I understand your argument now is, and has been, that the release claims language, which the district court didn't fully set out or discuss, is not ambiguous, but if it is ambiguous, it favors. That's exactly right. The release parties who were now agreeing are release parties. That's exactly right. And I would reserve the rest of my time, thank you.  May it please the court. Reagan Brown on behalf of the athletes in this case. Judge Phillips, you addressed, obviously, a critical question in your first question regarding how the court has appellate jurisdiction. What we argued and what we prevailed on in the district court was that this was a motion to enforce. A motion to enforce is a lesser version of a contempt motion and recognized for appellate purposes in the Feynman versus Volkswagen Ninth Circuit case that we cited and discussed in our brief. There was no discussion, no issue about jurisdiction there that a motion to enforce, such as what was at issue here, would give this court, would not somehow give this court appellate jurisdiction. And so for that reason, if there is an issue here, the issue is really with nomenclature. It's not with relief. I think to jump to the points that Judge Moritz and you and Judge Phillips were asking about with respect to the language, it's interesting, the concession that you heard about released parties, because obviously the Fishers have been contesting that from day one and now they've finally conceded it. Now that moves us to the released claims issue. The released claims issue was unambiguous. And it's interesting that I'm hearing the word ambiguity now because when we were in state court arguing this issue, the declaration of the Fishers was that the settlement agreement was unambiguous. That's still their position. That's what he said. Beg your pardon? That's still their position. Right. That's what he said. And yet what I heard and what I wrote down was an issue of ambiguity. If it, he said, and this is often the argument in these cases, as you know, if we were to say that it's not, that it's ambiguous, then that favors the Fishers as, because. Under traditional rules of contract construction, there's an ambiguity, of course, but it's not ambiguous. And the reason is. They're arguing that, you're both arguing that different ways. Correct. And what we argue. And so I guess I'd like you to address his statement that if we were to agree that it is, or not to agree with either one of you, but to say, well, it's ambiguous, what, who does that favor? Well, the traditional contract rules are when there's an ambiguity. To avoid releasing parties is what he said? Beg your pardon? How would it be construed in this case with a settlement agreement and release parties? In a settlement agreement with these parties, I don't think there's any question how it should be, how it was construed and how it should be. That's not my question. Okay. Your question is, if we find it ambiguous, how would that favor? Traditionally, a finding of ambiguity favors in the context of insurance, it favors the insurer. Right, right. It favors the party who claims that there is some question of fact about that. Traditionally. Here we're dealing with a different situation. Here we're dealing with a show cause order that the district court entered properly. And when we get to this issue, which I wanna address head on. Well, I wasn't talking about the show cause order, I was talking about the paragraph, the release claims paragraph that you both apparently contend is unambiguous in your favor. That's what I'm talking about. Correct. And here's why, Judge Marks. The reason why it's unambiguous in favor of the appellees and as construed by the district court, the district court obviously considered the entire provision. There was plenty of briefing on both sides. It wasn't clear from the court's order that it did. Well, it certainly was. Not at all. It was clear from the argument and we certainly made no bones. Well, we don't always look at the argument. I'm looking at the court's order. If you look back at our. And we're trying to interpret. We're trying to review the district court's interpretation of a paragraph. We've gotta ask, well, what was the district court looking at? What language was it looking at? Well, what it was looking at was it was looking at the entire definition of released claims and the entire definition when you look at it. It's very clear in the third sentence. It talks and uses the very inclusive language and specifically without limitation includes, which of course, this is not restrictive language. This is inclusive. It is expansive language. And if there were any question about that, if you go and you look. Are you talking about the including helium residue gas, natural gas, what language are you talking about? In the third sentence of section 1.35, the release claims. The release claims without limitation specifically include claims based in whole or in part on allegations. And then we have the next 13. And number 13 speaks directly to this situation. That as a result of the released parties, which again, there's been a concession here that we're included in that, that as a result of the released parties actions with respect to the class wells, no dispute over what the class wells are, the released parties are liable to class members for breach of contract, tortious breach and so on. And then if there were any question about that, later in the settlement agreement, there is specific language about, in fact, in the very next paragraph. I think we're making the same mistake here that we were talking about the district court making. We're not, you've got all of that is after this qualifying language related. The claims have to be related solely to the underpayment of royalties by XTO or on behalf of XTO. That precedes all of that, correct? And what precedes? So it narrows the provision. No. What does it do? What it does, it just. The district court didn't tell us. No, what the first sentence does, it just simply sets out what among other things are included. Remember that word include? If you look at other provisions within the settlement agreement, sometimes it uses the word include. Sometimes it uses the word means. Means is limiting language. It sets the boundaries of what's involved here. Include is expansive language. There's not a limitation on it. As a result, this first sentence is not limiting the rest of 1.35. It's just simply a portion of 1.35. That is the language, though, that the district court didn't really analyze, correct? It didn't. And that is the language that may or may not be ambiguous. We just don't really have any discussion of that as far as the district court. I would say, is there any language of the first sentence, any analysis of that? No, and I would say there didn't need to be because, again, it's just part of the entirety of 1.35. But if there were any question about that, if you look at the paragraph in 1.35 that follows the 13 enumerated provisions where it talks about the released claims do not include, in other words, now we have limiting language. Now we have excluding language. They do not include any allegations of underpayment or other claims with respect to royalty computed and paid by third-party operators. Precisely what is at issue in the case. And then we have the parenthetical. In other words, operators other than the released parties. And the released parties include ExxonMobil and ExxonMobil Oil Corporation. And so what we have is a release that is not ambiguous. You have a settlement agreement that is clear and unambiguous and released ExxonMobil and ExxonMobil Oil Corporation. And as a result, this was a situation where the district court properly decided that what we have here is a situation where this part of the case, the Fishers case, in the state court cannot proceed for the May 2002 to May 2017 time period. The rest of their case can. The federal district court imposed no restrictions on the rest of their case. It just said, you've released this part. And we, of course, did what we are instructed to do under all of the case law. We went to the state court first. We sought relief there. We tried to get the matters resolved and the state court did not resolve them. And instead, we therefore had to go to the district court and the district court in a very prudent manner as opposed to using contempt. It found in the motion to enforce in a manner that allows this case to go forward, but not for the portion that's already been released and was part of the $220 million in compensation that was part of this settlement agreement. So for those reasons, this is a case clearly that can and should be affirmed and the district court's order and judgment should be affirmed. Oh, I'm sorry, I didn't realize you were leaving. I have a couple of questions.  Judge Phelps, far be it from me to tell you no on that, so I'm happy to address whatever you have. Well, I always think it's a sign of skill when someone leaves early, so. On the appellate jurisdiction point, there's a case, Thomas v. Blue Cross and Blue Shield, 11th Circuit, 2010, that tracks this very closely, our situation here. And as I understand, it says no final order until you get to the contempt part of things. Are you familiar with that case? I'm not gonna try to say otherwise. No, I'm not. And that's why I focused and directed in answering the question you had asked, counsel, to the Feynman case, because it does deal with a situation where contempt was not necessary in order for there to be appellate jurisdiction. I will have to look at the case you've cited from the 11th Circuit, because I have not seen a case that says there is no jurisdiction when there is a motion to enforce, as we have here. Well, maybe I could solicit from each of you, if you'd be that kind, to give us a 28-J letter on Thomas v. Blue Cross. It's 594 F. 3rd, 823, 11th Circuit, 2010. Happy to do so. All right, thank you very much. Did you have anything else, Judge Phillips? I'm not gonna leave this time. There was something else that you had. At the risk of undermining your credibility with Judge Phillips, I might ask you a question or two. I'm happy to respond, Judge Garcia. So let me ask, are the substance of the claims that the Fishers brought and those that were dealt with in the Chieftain case, are they the same? In other words, are they seeking the same damages for royalty payment? It's the same type of claim. I mean, it's a different monetary amount. And remember, Judge Garcia, the Fishers were class members. They got money in the Chieftain case. So yeah, it's all part of the same thing. It's just they may wanna try to characterize it slightly differently, but at the end of the day, it's royalty under payments. Same type of claim. So what's strange to me, just as a procedural matter then, is so the Fishers case comes first. Then the Chieftain case is settled. If they were addressing the same claims, why not include that lawsuit expressly in the settlement agreement in Chieftain? Well, and I think, Judge Garcia, I think you've probably seen this a number of times, we had different lawyers involved. And I know- Less skilled counsel. And the lawyers for the Fishers, I think were very protective of their case. And I don't think they wanted any part of the Chieftain case, which had a different panoply of lawyers. But I'm riffing. I'm just telling you what I think. I know what happened, but it's not in the record. But if I remember correctly, at some point, at least the plaintiffs in both cases have the same lawyer, Mr. Sharp, no? That is correct. All right. The same lawyer, Mr. Sharp, who acknowledged in the Key case and acknowledged in the Wheeler case that those claims were all settled and released between 2002 and 2017. But the temporal scope of those cases, was there any overlap in those cases with Chieftain, the time period in Chieftain? There was absolute overlap for that 2002 to 2017 time period. There's no overlap after 2017, although I don't really think there are any claims there. There's certainly overlap prior to 2002. I'm sorry, there is no overlap prior to 2002 that the Chieftain settlement did not cover claims before 2002. That's what's at issue in Fisher. All right. Thank you. I saved you 12 seconds. Thank you, Counselor.  Thank you. On Mr. Sharp's alleged concessions, Mr. Sharp was only representing other parties. And as we've talked about, he's not bound by statements made on behalf of other parties. There was also, they don't even argue that he agreed that the claims were released. The issue was the parties. But we don't even need to get there. You didn't hear any response to the kill shot. You never get to interpret the contract unless you can enforce this injunction. And as we pointed out, there's no clear and convincing evidence. There's no knowledge. You heard no answer to that. They jumped straight to the substance, which you only get to if the federal court had the ability to enforce this injunction. It's absolutely conceivable. Tell me again what's lacking. The kill shot, so-called. Clear and convincing evidence that the Fishers had knowledge that they were bound by this injunction. Don't they have knowledge of the agreement? They were a party. There's absolutely no evidence, and there's absolutely no attempt to meet the clear and convincing evidence standard. That would require an evidentiary hearing, which never occurred because Exxon didn't do that. They didn't opt out. They didn't opt out because they didn't have a reason to. The procedural history is laid out in the briefs. Exxon transferred the Fishers' wells in 2013. The Fishers made $850 in the settlement because from 2013 until 2017, XTO was operating those wells. We don't dispute that we got paid $850. The issue is that they don't relate solely to XTO, which was Judge Garcia's question. You can't get around the first two sentences of 1.35. Okay, thank you very much. It's been a good day of good arguments, and we appreciate yours. The case is submitted, and counsel are excused.